# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SARAH R. WALDRON,  )
)
)
**Plaintiff,**  )
)
v.  )   No. 17 C 3928
)
)   Magistrate Judge Sidney I. Schenkier
NANCY A. BERRYHILL, Acting  )
Commissioner of Social Security,  )
)
**Defendant.**  )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Sarah Waldron, seeks reversal and remand of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her applications for disability benefits (doc. # 16: Pl.'s Mem.). The Commissioner has filed a response asking the Court to affirm the ALJ's decision (doc: # 25: Def.'s Resp.). For the following reasons, we agree with Ms. Waldron that remand is necessary.

## I.

Ms. Waldron filed for Disability Insurance Benefits ("DIB") on July 20, 2009 and Supplemental Security Income ("SSI") on August 6, 2009, at the age of 33 (R. 160-62) alleging a disability onset date of June 1, 2008, which she later amended to June 15, 2007 (R. 165). After Ms. Waldron's applications were denied initially and on reconsideration, the Administrative Law Judge ("ALJ") held a hearing on May 15, 2012, and subsequently issued a written opinion denying her applications for benefits. Ms. Waldron appealed that decision to federal court, and Magistrate

---

[1]On January 23, 2018, by consent of the parties and pursuant to 28 U.S.C. §636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 23).

Judge Daniel G. Martin issued an order remanding the ALJ's decision (R. 1270-76). On remand, the ALJ held two additional hearings, on September 13, 2016 and January 19, 2017, and then issued another opinion denying Ms. Waldron's applications for benefits. The Appeals Council denied Ms. Waldron's request for review of that decision, making the ALJ's decision the final decision of the Commissioner (R. 1). *See* 20 C.F.R. § 404.981.

## II.

At the time of her alleged onset date, Ms. Waldron's primary care physician, Gordon R. Lang, M.D., was attempting to wean Ms. Waldron off Norco (hydrocodone, a narcotic), which she had been taking for chronic back pain (R. 451). In July 2007, he began prescribing Suboxone to treat Ms. Waldron for narcotic addiction (R. 432-33, 441-45).[2] Ms. Waldron also took alprazolam (Xanax) for anxiety and Adderall for attention-deficit hyperactivity disorder ("ADHD") (R. 409-10, 414, 418-19, 432-37). Dr. Lang continued to prescribe Suboxone and Xanax through Spring 2009; he occasionally increased the dosages to better control Ms. Waldron's pain and anxiety (R. 456-61, 467-76, 495-99). At times, Ms. Waldron reported running out of her medications or visiting multiple pharmacies to fill her prescriptions (R. 466, 492).

On August 9, 2009, Ms. Waldron was in a motor vehicle accident. She was driving with her seven-year old son in her car when she struck a truck parked on the shoulder (R. 712). Both Ms. Waldron and her son were seriously injured; tragically, her son died of his injuries in February 2010 (R. 482, 787). Upon admission to the hospital, Ms. Waldron was treated for polysubstance abuse, including cocaine, benzodiazepines (prescription central nervous system antidepressants,

---

[2]Suboxone is a combination of buprenorphine and naloxone, which is used to treat opioid dependence and addiction. Opioids are a class of drugs that include heroin, fentanyl and pain relievers such as oxycodone, hydrocodone, codeine, morphine and others. https://www.drugabuse.gov/drugs-abuse/opioids. Buprenorphine is an "opioid partial agonist-antagonist" and naloxone is an "opioid antagonist. "[T]he combination of buprenorphine and naloxone work to prevent withdrawal symptoms when someone stops taking opioid drugs by producing similar effects to these drugs." https://medlineplus.gov/druginfo/meds/a605002.html.

such as Xanax), and amphetamines (central nervous system stimulants that can include Adderall). She also underwent surgery to treat fractures in her right thighbone, right heel, and C6 cervical vertebra, as well as a lacerated spleen (R. 712, 715-18). Ms. Waldron was prescribed oxycodone (a narcotic) for pain, as well as Xanax for anxiety and sertraline (Zoloft) for depression (R. 715).

After her discharge from the hospital, Dr. Lang prescribed Ms. Waldron methadone (an opiate analgesic) for pain and Xanax and Zoloft for her severe anxiety and depression over her son (R. 482, 485-88, 515-16).[3] In January 2010, Ms. Waldron sought to refill her methadone early because she had used more than expected, and from April through June 2010, Ms. Waldron sought refills of methadone from Dr. Lang for persistent leg pain (R. 506-10, 522). On April 6, 2010, Ms. Waldron's surgeon, Hobie Summers, M.D., also renewed her methadone prescription for her complaints of pain in her right hip, knee, foot and ankle (R. 787). On examination, he observed she had "excellent range of motion of her knee, hip as well as her ankle," about 50 percent joint range of motion in her foot, and no knee instability (R. 787). X-rays showed Ms. Waldron's heel fracture was healed, but her thigh fracture had not completely consolidated (*Id.*).

On June 25, 2010, Ms. Waldron was brought to the hospital after attempting suicide by overdosing on methadone and Xanax; her suicide note said she wanted to be with her late son (R. 597-98). Ms. Waldron was diagnosed with severe, recurrent major depressive disorder and polysubstance abuse versus dependence (R. 599). She was admitted for inpatient psychiatric treatment at Alexian Brothers Behavioral Health Center (R. 636). While there, she received

---

[3]"Methadone is used to relieve severe pain in people who are expected to need pain medication around the clock for a long time and who cannot be treated with other medications. It also is used to prevent withdrawal symptoms in patients who were addicted to opiate drugs. . . . Methadone works to treat pain by changing the way the brain and nervous system respond to pain. It works to treat people who were addicted to opiate drugs by producing similar effects and preventing withdrawal symptoms in people who have stopped using these drugs." https://medlineplus.gov/druginfo/meds/a682134.html.

oxycodone and methadone for her right leg and foot pain (R. 641-42). Ms. Waldron was discharged from inpatient care on July 5, 2010 (R. 636).

On July 12, 2010, Dr. Lang prescribed Norco for Ms. Waldron's pain (R. 655). On August 3, 2010, Dr. Summers observed Ms. Waldron had "excellent range of motion" of her knee, hip, and ankle, 50 percent range of motion in her foot joint, and Dr. Summers considered her thigh fracture to be united (R. 786). Dr. Summers prescribed Norco at Ms. Waldron's request, but stated that would be "the very last time [he] ever give[s] her pain medication" (*Id.*).

On August 28, 2010, Debbie L. Weiss, M.D., conducted an internal medicine examination of Ms. Waldron on behalf of the Department of Disability Services ("DDS") (R. 804). On examination, Ms. Waldron's right heel was tender and she could not heel or toe walk, but she had full range of motion and muscle strength and her posture and gait were unremarkable (R. 806-07). In September 2010, a non-examining state agency doctor opined Ms. Waldron did not have a severe physical impairment (R. 816). On August 28, 2010, Ms. Waldron also underwent a psychiatric evaluation for DDS, at which she was noted to be talkative and tearful (R. 812-15). On September 21, 2010, a non-examining state agency psychologist, Phyllis Brister, Ph.D., opined Ms. Waldron had ADHD, major depression and a recent history of polysubstance dependence (R. 820-22), and checked boxes indicating these impairments caused mild restrictions in activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation of extended duration (R. 829-30).

John C. Sarantopoulos, D.O., an Illinois-based specialist in physical medicine and rehabilitation, began treating Ms. Waldron on October 29, 2010. Ms. Waldron's examination was normal, but her right heel was mildly tender (R. 943). He prescribed a 13-day supply of Norco (6

tablets daily), Mobic (a nonsteroidal anti-inflammatory drug, or "NSAID") for pain and inflammation, and Neurontin (gabapentin, an anti-seizure drug used to treat chronic pain) (*Id.*). On November 3, 2010, Ms. Waldron reported using eight Norco tablets per day, and Dr. Sarantopoulos prescribed an 11-day supply of seven tablets day (R. 930, 939).

On December 7, 2010, Ms. Waldron visited Asim Khan, M.D., at the Arizona Pain and Spine Institute in Mesa, Arizona (R. 1150). Dr. Khan reported that a Urinary Drug Screen ("UDS") revealed THC (tetrahydrocannabinol, the active ingredient in marijuana), opioids and benzodiazepines (*Id.*). Dr. Khan prescribed MS Contin (morphine) (R. 1149-50). On December 13, 2010, Ms. Waldron was back in Illinois and requested additional pain medication from Dr. Sarantopoulos (R. 933).

On December 20, 2010, Ms. Waldron was in Arizona, and Dr. Khan prescribed her Opana (oxymorphone, a narcotic to treat moderate to severe pain) (R. 1146-47). He assessed her with chronic pain syndrome, neuralgia and myalgia (*Id.*). On December 30, 2010, Dr. Khan prescribed Neurontin and morphine because Opana was not covered by Ms. Waldron's insurance (R. 1143-44). On January 6, 2011, Ms. Waldron reported that her pain persisted, and Dr. Khan started her on a fentanyl patch (a narcotic used to treat severe pain) (R. 1140-41). On January 11, 2011, he replaced fentanyl and morphine with prescriptions for Norco and oxycodone, and on January 18, 2011, Dr. Khan increased her dose of Norco and noted that Ms. Waldron had an antalgic gait (R. 1134-38). On January 21, 2011, Ms. Waldron returned to Dr. Sarantopoulos and received a two-week supply of Norco for her pain (R. 930).

In February 2011, Dr. Khan continued prescribing Neurontin, Norco, and morphine, and gave Ms. Waldron Lumbar Sympathetic plexus Blocks ("LSB") to address her "complex regional pain syndrome" in her right lower extremity (R. 1119-29). In March 2011, Ms. Waldron's UDS

was positive for substances beyond what Dr. Khan prescribed, including THC, opiates, amphetamines, methamphetamines, benzodiazepines, TCA, and oxycodone (R. 1111-15). Dr. Khan cautioned Ms. Waldron against using more of her pain medications than he prescribed and admonished her for twice violating the terms of her narcotics agreement, but he renewed her prescriptions for morphine, Neurontin and Norco in March and April 2011 (R. 1109-12).

On January 18, 2011, Ms. Waldron met with a psychiatrist at Jewish Family & Children's Service ("JFCS") in Arizona (R. 905). The psychiatrist noted that Ms. Waldron suffered from moderate major depression and that she was "very med[-]seeking," and became "upset and requested [a] new prescriber after learning she was only getting 15 mg" of Adderall, in addition to Zoloft and Xanax (R. 907). On February 2, 2011, Ms. Waldron saw a different psychiatrist at JFCS, who maintained her current dose of Adderall and decreased her dose of Xanax out of concern that she had become addicted to it (R. 979). In March 2011, Ms. Waldron "complain[ed] bitterly" to her JFCS psychiatrist that she needed test results before being allowed to continue taking Adderall; she felt she was being treated unfairly (R. 975). At her last visit to JFCS, in April 2011, Ms. Waldron did not want to decrease her Xanax and wanted to restart Adderall (R. 973).

On February 29, 2012, Ms. Waldron returned to Dr. Sarantopoulos; he prescribed her Zoloft, Xanax, Norco and Neurontin (R. 1076). Dr. Sarantopoulos noted that he managed Ms. Waldron's pain with medications because she did not have insurance for nerve blocks (Id.). On that date, Dr. Sarantopoulos filled out a residual functional capacity ("RFC") form, listing Ms. Waldron's diagnoses as chronic pain and anxiety (R. 1075). Dr. Sarantopoulos opined that in an eight-hour workday, Ms. Waldron could sit for two hours total, 45 minutes at a time, and stand or walk for one to two hours total, for 20 minutes at a time, and she would need to shift positions at will and take unscheduled breaks every two hours for 10 minutes at a time (R. 1074). She could

frequently lift up to 20 pounds, and was limited in repetitive reaching, handling, fingering up to 50 percent on the right side, with no limits on the left (R. 1075).

On March 9, 2012, at Ms. Waldron's request, Dr. Sarantopoulos prescribed additional Norco for increased right leg pain (R. 1102). On March 13, 2012, Ms. Waldron faxed a letter to Dr. Sarantopoulos stating that she was "bothered" and felt "degrad[ed]" by his "allegations" that she had purposefully ruined her prescription, apparently to get an additional prescription for Norco (R. 1101). Nevertheless, on March 14, 2012, Dr. Sarantopoulos prescribed her Percocet (oxycodone), and on March 23, 2012, he prescribed her Norco (R. 1095-97).

On May 5, 2012, at her first hearing before the ALJ, Ms. Waldron described having pain from her right hip to toe, primarily around her ankle (R. 46-47); she said that medication was never completely effective in relieving her severe pain (R. 61). She stated that no doctor had suggested she might be dependent on narcotics (R. 49), though she had developed a tolerance to pain medication (R. 61). Ms. Waldron testified that she had good days and bad days, but even on a good day she could only sit for 1.5 hours at a time (while shifting her weight) and had to lay down for one hour, three times a day (R. 53-55). Ms. Waldron also testified that she had crying spells every day and had trouble thinking, concentrating, and focusing (R. 50-51). She also had panic attacks, but they stopped with medication (R. 52). An independent medical expert, clinical psychologist Mark Oberlander, Ph.D., testified at the hearing that Ms. Waldron had mild limitations in ADLs, moderate limitations in social interaction and capacity for attending and concentrating, and no episodes of decompensation (R. 73-74).

On July 15, 2013, Ms. Waldron returned to Dr. Sarantopoulos, complaining of right leg, foot and ankle pain, as well as low back and neck pain (R. 1567). Dr. Sarantopoulos noted her diagnoses included chronic pain syndrome and CRPS (complex regional pain syndrome) of her

right lower extremity, but she was non-tender and had a non-antalgic gait (*Id.*). He prescribed oxycodone and morphine and performed osteopathic manipulative treatment ("OMT") to treat Ms. Waldron's pain (R. 1538-62).

From November 2013 through May 2016, Ms. Waldron was incarcerated for aggravated driving under the influence, related to the car accident that resulted in her son's death (Pl.'s Br. at 6, citing R. 1534). The record contains only a few notes from her time in jail, which indicate Ms. Waldron was depressed but refused medication in favor of spiritual help (R. 1604-08, 1612, 1618). On November 7, 2014, while Ms. Waldron was in prison, the first ALJ opinion was remanded from the district court (R. 1268-76).

On May 13, 2016, three days after she was released from prison, Ms. Waldron returned to Dr. Sarantopoulos, complaining of pain in her right hip, ankle and foot, neck and low back pain, and anxiety and panic attacks (R. 1534). Ms. Waldron reported that her symptoms worsened in prison (*Id.*). She had bilateral cervical and lumbar tenderness and appeared emotional (*Id.*). Dr. Sarantopoulos diagnosed her with chronic and myofascial pain, and prescribed Xanax, high dose Motrin, and Norco (*Id.*). From June through August 2016, Dr. Sarantopoulos renewed Ms. Waldron's prescriptions and performed OMT (R. 1569, 1629, 1634-40). MRIs showed Ms. Waldron had mild disc bulge and mild to moderate bilateral foraminal stenosis in her cervical spine (R. 1625) and minimal or no bulging or narrowing in her lumbar spine (R. 1627).

On August 1, 2016, Ms. Waldron began receiving mental health treatment at DuPage County Health Department (R. 1571). Mental examination showed she had impaired attention, concentration and memory, but was otherwise normal (R. 1580). Ms. Waldron was diagnosed with moderate major depressive disorder, ADHD, and generalized anxiety disorder (R. 1582). From August 8, 2016, through December 19, 2016, Ms. Waldron had several follow up appointments

with psychiatrist, Ravi Valluripalli, M.D., at DuPage County Health. At these visits, Ms. Waldron reported feeling depressed, hopeless, helpless and anxious, and Dr. Valluripalli at times observed that Ms. Waldron had abnormally fast paced speech, agitated motor activity, and attention and concentration ranging from "poor" to intact (R. 1692-95, 1771-74, 1782-86, 1793-96). Dr. Valluripalli prescribed Xanax, Zoloft and Adderall (R. 1780, 1776).

On September 13, 2016, Ms. Waldron testified at a hearing before the ALJ that the pain in her right foot was so intense she could only stand ten seconds in one place (R. 1206-07). She stated that she took up to four Norco on bad days – about 20 days per month – but she was "leaning towards nonnarcotic pain management" (*Id*.). Ms. Waldron testified that she could sit for one hour straight on a good day, and had no difficulty dressing, showering, doing laundry, and cleaning around the house (R. 1208-10). She watched her two-year-old autistic nephew for four hours per week, but the next day her foot hurt even more (R. 1215-16). Ms. Waldron was an "emotional support system" for her mom (R. 1211), but she did not always provide her mother adequate emotional support because her own depression and anxiety got in the way (R. 1217). Ms. Waldron testified that she had crying spells three times per week and panic attacks about once every ten days; her anti-anxiety and antidepressant medication helped resolve her panic attacks but made her drowsy and foggy (R. 1217-22). Taking Adderall improved her ability to focus and concentrate but did not completely alleviate her problems (R. 1221).

On September 14, 2016, Dr. Sarantopoulos noted Ms. Waldron's last UDS had multiple abnormalities and was positive for cocaine (R. 1673-75). Ms. Waldron asked about Suboxone treatments, but Dr. Sarantopoulos would not write a prescription for Suboxone, and he noted Ms. Waldron "appeared uninterested" in non-narcotic pain medications or physiotherapy (R. 1670). On September 19, 2016, Dr. Valluripalli referred Ms. Waldron for an evaluation to receive

Suboxone for her prescription substance use and abuse problems (R. 1785-86). On September 24, 2016, Ms. Waldron sought Suboxone treatment at Advance Psychiatry and Counseling with psychiatrist, Alan R. Hirsch, M.D. Dr. Hirsch conducted a mental status examination, which showed Ms. Waldron was hyperverbal and anxious, with moderately impaired attention/concentration, racing thoughts, and mildly impaired memory (R. 1723). Dr. Hirsch prescribed Suboxone and observed that Ms. Waldron was anxious and hyper, with impaired concentration and attention (R. 1719-20).

From September 28, 2016 through November 19, 2016, Ms. Waldron followed up biweekly with psychiatrist, Aqeel Khan, M.D., at Advance Psychiatry and Counseling. At these visits, mental status examinations showed that her mood fluctuated from normal to depressed or anxious, her concentration and attention fluctuated from 65 percent to unimpaired, her speech was at times hyperverbal, she occasionally demonstrated racing thoughts, and her mood was sometimes agitated and hyper (R. 1698-1704, 1716-19).

From September through December 2016, Ms. Waldron also received regular mental health therapy from Dana Martin, M.A., at DuPage County Health (R. 1766-69). At these visits, Ms. Waldron demonstrated a dedication to therapy and a desire to decrease her use of pain medication (R. 1676-82, 1685-86, 1693, 1788-89). On December 20, 2016, Ms. Martin filled out a mental impairment questionnaire for Ms. Waldron. She indicated that Ms. Waldron's affect was congruent to her mood, which was usually down and anxious (R. 1726-27). Ms. Martin checked boxes indicating Ms. Waldron had "limited but satisfactory" mental abilities needed to do unskilled work, but she was "seriously limited, but not precluded" from maintaining attention for a two-hour segment and performing at a consistent pace without an unreasonable number and length of rest periods (R. 1729-30). She opined Ms. Waldron was "unable to meet competitive standards" to

complete a normal work day or week without interruptions because she "may struggle to work for long periods of time due to physical pain as well as having difficulty focusing due to her high level of anxiety and tendency to dissociate especially when overwhelmed" (*Id.*). Ms. Martin opined that Ms. Waldron had moderate restriction in ADLs, marked difficulties in maintaining social functioning, moderate deficiencies in concentration, persistence or pace, and she would likely be absent from work about three days per month (R. 1732-33).

On January 19, 2017, at a supplemental hearing before the ALJ, Ms. Waldron testified that she was improving with therapy and trying to deal with her grief after spending a lifetime avoiding pain (R. 1189-90). She testified that she no longer abused substances or even took narcotic pain medication because Suboxone helped get rid of her cravings (R. 1190-91). She still took prescription ibuprofen and Neurontin (R. 1191-92).

### III.

On March 22, 2017, the ALJ issued an opinion denying Ms. Waldron's applications for benefits. The ALJ found Ms. Waldron had severe impairments of right lower extremity disorder, spinal disorder, anxiety, depression, ADHD, post-traumatic stress disorder, personality disorder, and history of polysubstance abuse, but that the impairments, even in combination, did not meet or medically equal the severity of a listed impairment (R. 1157-59). The ALJ applied the revised medical criteria for evaluating mental disorders (R. 1160).[4] Under the revised Paragraph B criteria, the ALJ determines the degree to which a claimant's medically determinable mental impairments affect his or her ability to: "understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself."

---

[4]The revised criteria went into effect on January 17, 2017. *See Crowder v. Berryhill*, No. 16 C 11247, 2017 WL 3263455, at *5 n.4 (N.D. Ill. Aug. 1, 2017) (citing Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138–01, 2016 WL 5341732, at *66138 (Sept. 26, 2016)).

https://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm. "To satisfy the paragraph B criteria, [a claimant's] mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." *Id.*

The ALJ found Ms. Waldron had moderate limitations in understanding, remembering or applying information (R. 1160). In addition to relying on Dr. Oberlander's assessment, the ALJ found Ms. Waldron testified at her hearings without any evidence of poor memory or recall and she presented as a good historian at her medical examinations (*Id.*). The ALJ assessed Ms. Waldron with mild to moderate limitations in interacting with others because she did not have trouble being around strangers at the hospital, traveling, communicating via text and social media, living with her family, and providing her mother with emotional support (R. 1160-61).

The ALJ accepted Dr. Oberlander's assessment that Ms. Waldron was moderately limited in maintaining concentration, persistence or pace (R. 1160). The ALJ found Ms. Waldron "sometimes" was not impaired in these areas because she could follow written instructions, watch a two-year old autistic child, handle funds, paint and craft, follow the plot of television shows, read the Bible, garden, text, use social media and care for her pet (R. 1161). She also responded appropriately at the hearing (*Id.*). The ALJ determined Ms. Waldron had only mild limitations in adapting or managing herself because she maintained her own hygiene, self-administered medication, helped her mother with her medical care, controlled her emotions in public ("[o]ther than getting upset when her requests for medication" were denied), and she responded well to recent mental health interventions (R. 1160-62).

The ALJ opined that Ms. Waldron had the RFC to perform sedentary work with an option to stand one to two minutes after sitting for one hour (R. 1162). In addition, the ALJ limited Ms. Waldron to no public contact, occasional contact with co-workers and supervisors, and

"understanding, remembering and carrying out no more than simple, routine tasks, performing the same tasks day in and day out with no strict quotas (meaning no one should be checking up during the workday to make sure keeping on pace)," but the work could be measured by what was completed by the end of the workday (*Id.*).

The ALJ found Ms. Waldron's statements concerning the intensity, persistence and limiting effects of her symptoms "not entirely consistent" with the evidence (R. 1164). Physically, the ALJ did not find credible her allegations of uncontrolled pain and mobility difficulties (R. 1165). The ALJ noted that less than a year after the motor vehicle accident, her surgeon found she had "excellent range of motion" and was healing well, and the state agency examiner found she had full range of motion and normal muscle strength and gait (R. 1164-65). The ALJ also noted multiple examinations where Dr. Sarantopoulos observed Ms. Waldron had a non-antalgic gait, full range of motion and normal muscle strength (R. 1165, 1169-70). The ALJ herself observed that at the hearings, Ms. Waldron "was able to ambulate normally without any evidence of distress or discomfort" (R. 1170). In addition, the ALJ noted that "[w]hile the claimant complained of pain, she also acknowledged doing well on medication" and she was able to travel between Illinois to Arizona (R. 1165). The ALJ stated that the sit-stand option in the RFC was in "deference" to Ms. Waldron's testimony that "she needs to stand after sitting for a while," but that her testimony that she needs to lie down during the day was not supported by the record (R. 1166-67).

The ALJ gave "little weight" to Dr. Sarantopoulos's RFC opinion from 2012 (R. 1169-70). Despite the "longitudinal treatment relationship" Ms. Waldron had with Dr. Sarantopoulos, the ALJ found that the record, including Dr. Sarantopoulos's own treatment notes showing normal physical examinations and gait, did not support the type of limitations described by Dr. Sarantopoulos in his opinion (*Id.*). In addition, the ALJ noted that even after MRIs of Ms.

Waldron's back showed mild to moderate issues in 2016, Dr. Sarantopoulos continued to prescribe the same pain medication regimen to Ms. Waldron (R. 1166).

The ALJ recognized that Ms. Waldron had "a longstanding history of chronic pain," but found that the record, including notes from both her treating pain doctors, Dr. Sarantopoulos and Dr. Khan (whom the ALJ referred to by his first name, Asim), "raise[d] questions about the abuse of prescription medication" (R. 1169-70). The ALJ found the record was "prevalent with medication seeking behavior, even after being in prison for her DUI" (R. 1168). The ALJ noted that on August 3, 2010, Dr. Summers refused to prescribe her more pain medication, and "on October 3, November 9, November 11, December 3, 2010, and June 4, 2011, the claimant presented to multiple emergency rooms requesting pain medication after alleging that she had run out each time" (R. 1164-65). In addition, Ms. Waldron visited Drs. Sarantopoulos and Khan primarily to request pain medication, and she sometimes tried to fill prescriptions for Norco and morphine that were already filled by the other physician (R. 1165-66). Indeed, the ALJ noted that Dr. Khan warned Ms. Waldron that she "had violated the terms of her narcotics agreement twice" (R. 1165). The ALJ found it "suspect" that Ms. Waldron stopped treatment with Dr. Sarantopoulos when he refused to prescribe Suboxone rather than pursuing other treatment (R. 1166).

With regard to her mental impairments, the ALJ acknowledged Ms. Waldron "has a long history of ADHD, anxiety, and depression," but that her anxiety was "well-controlled with Xanax" until she attempted suicide in June 2010 (R. 1167). However, the ALJ noted that at the August 28, 2010 state agency psychological examination and subsequent mental examinations, Ms. Waldron was "alert, calm, cooperative, and [well-]oriented" (*Id.*). The ALJ acknowledged that at the psychiatric evaluation at JFCS in January 2011, Ms. Waldron complained of difficulty staying on task, paying attention, increased depression and anxiety, and she was diagnosed with moderate

major depression, post-traumatic stress disorder and personality disorder (R. 1167-68). However, the ALJ noted her mood was stable, her affect congruent, her thought process logical, and she had fair memory, insight and concentration (*Id.*). In addition, the ALJ found "subsequent psychiatric progress notes indicate that the claimant's mood was stable and that her anxiety was under good control with Xanax" and she "often presented as cooperative with good concentration, fair insight and judgment, a euthymic [stable] mood, and affect that was appropriate to content" (R. 1167-68).

After Ms. Waldron was released from prison, the ALJ noted that she reported an increase in depressive symptoms and anxiety, but her "mental status examinations have been within normal limits with some impairments noted in concentration," and she "has made progress and responded well to treatment" (R. 1168). The ALJ also did not find her testimony on the severity of her mental impairments to be credible because she could follow plots of shows, use a computer for social networking, use her cell phone to text, care for her personal needs, shop, do dishes, prepare meals, vacuum, dust, do laundry, attend church, read, care for her pet, and scrapbook (R. 1163-64).

The ALJ gave "some weight" to the September 2010 opinion of state agency psychologist, Dr. Brister, but added mental limitations to the RFC "in consideration of" Ms. Waldron's testimony and later evidence (R. 1169). The ALJ gave "little weight" to the December 2016 mental RFC opinion of Ms. Waldron's therapist, Ms. Martin (R. 1170). The ALJ reasoned that Ms. Martin had only treated Ms. Waldron for four months and thus "did not have a longitudinal treatment relationship with Ms. Martin when she rendered this opinion" (*Id.*). In addition, the ALJ noted that Ms. Martin did not cite any clinical examination findings, and the ALJ found Ms. Martin's opinion was inconsistent with Ms. Waldron's ability to provide emotional support for her mom and care for her two-year old autistic nephew for four hours per week (R. 1170). Ultimately, the ALJ found Ms. Waldron was not disabled based on either her mental or physical impairments (R. 1171-72).

## IV.

The ALJ found that Ms. Waldron was not disabled, despite acknowledging her long history of chronic pain, substance abuse, and mental health struggles. Although plaintiff argues multiple grounds for remand, our decision focuses on the ALJ's findings as to Ms. Waldron's substance abuse and mental impairments.

### A.

At the outset, we reject Ms. Waldron's contention that the ALJ's determination that she abused prescription medications was not supported by the evidence (Pl.'s Br. at 14). Ms. Waldron claims that Drs. Sarantopoulos and Khan noted her "reliance" on and "long-term use" of pain medications, but never indicated they believed she was misusing or abusing prescription medication or opioids (*Id.*). Ms. Waldron contends that she simply needed to take additional medication to attempt to address her increased pain (*Id.* at 14-15, 25-26). She argues that the ALJ was improperly attacking her "general character" rather than her credibility for not adhering to her narcotics agreement with Dr. Khan (*Id.* at 25).

"[I]t is a challenge indeed to determine whether [the claimant's] plea for drugs was related to a desire to alleviate severe [] pain or a need to satisfy an addiction—or both. . . . It is the province of the ALJ to assess all of that evidence and reach a reasoned determination based on that evidence." *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014). Here, the ALJ determined that the evidence reflected Ms. Waldron's drug dependence and medication-seeking behavior. The ALJ noted multiple medical providers reported that Ms. Waldron misused or overused her pain medication, and Ms. Waldron had sought narcotic medication from multiple doctors at the same time and discontinued treatment with doctors who would not prescribe her desired medication. The Seventh Circuit has described such behavior as drug abuse or drug-seeking. *See, e.g., Simila*

*v. Astrue*, 573 F.3d 503, 519-20 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 545-46 (7th Cir. 2008); *McFadden v. Berryhill*, 721 F. App'x 501, 506 (7th Cir. 2018).

We commend Ms. Waldron for her most recent efforts with Dr. Hirsch to treat her dependence and addiction to opioids, and we hope that she continues these admirable endeavors. However, the ALJ reached a reasoned, well-supported determination that throughout the record, Ms. Waldron's pursuit of pain medication was evidence of medication-seeking behavior.

### B.

That said, a substance abuse problem is not inconsistent with the presence of a chronic pain condition or a mental health impairment. *See Moore*, 743 F.3d at 1125 (substance abuse problem not inconsistent with chronic migraines); *see also Voigt v. Colvin*, 781 F.3d 871, 876-78 (7th Cir. 2015) (substance abuse problem may exacerbate, but not be primary cause of, mental health problems). In this case, the ALJ's determination that Ms. Waldron mental impairments were not disabling was not supported by substantial evidence. We reach that conclusion for several reasons.

*First*, the ALJ's determination improperly overlooked evidence of Ms. Waldron's mental health impairments from medical professionals including Dr. Valluripalli, Dr. Aqeel Khan and Dr. Hirsch in 2016. In her opinion, the ALJ confined her discussion of Dr. Hirsch to a note that Ms. Waldron testified "she is in treat[ment] with Dr. Hirsch, a substance abuse specialist" (R. 1164). The ALJ did not mention Drs. Valluripalli or Khan by name. Nevertheless, the ALJ concluded that since she was released from prison in 2016, Ms. Waldron's "mental status examinations have been within normal limits with some impairments noted in concentration," and she "has made progress and responded well to treatment" (R. 1168).

"An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." *Gerstner v. Berryhill*, 879

F.3d 257, 261 (7th Cir. 2018) (internal quotations and citations omitted). In *Gerstner*, the ALJ erred by focusing on notes about mood and affect but ignoring the psychiatrist's diagnoses of depression and anxiety disorder. *Id.* at 261-62. In the instant case, the ALJ acknowledged that "some" impairments were noted in concentration, but we cannot "discern from the ALJ's scant analysis whether [she] considered and dismissed, or completely failed to consider, this pertinent evidence" of the other symptoms of mental health impairments that Drs. Khan, Valluripalli and Hirsch observed, including racing thoughts, anxiety, mildly impaired memory, concentration that ranged from poor to intact, hyperactivity and agitation. *Plessinger v. Berryhill*, 900 F.3d 909, 917 (7th Cir. 2018) (internal citations and quotations omitted). Thus, "the ALJ did not build a logical bridge from the evidence to h[er] conclusion" that would "allow this court to undertake a meaningful review" of the ALJ's finding. . ." *Id.*

*Second*, the ALJ did not adequately explain her decision to give more weight to the opinions of non-examining medical professionals from 2010 and 2012 than to the December 2016 mental RFC opinion of Ms. Waldron's treating mental health counselor, Ms. Martin. The ALJ gave some weight to the September 2010 opinion of non-examining state agency psychologist, Dr. Brister, and although the ALJ did not explicitly assign weight to the May 2012 testimony of non-examining clinical psychologist, Dr. Oberlander, the ALJ relied on his testimony in her opinion. By contrast, the ALJ gave little weight to Ms. Martin's opinion, who provided regular mental health counseling to Ms. Waldron from September through December 2016.

An ALJ should generally give more weight to the opinion of a source who has examined a claimant than to the opinion of a source who has not. *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (citing 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1)). The ALJ must provide a valid explanation for preferring a record reviewer's analysis over that of an examining doctor.

*Beardsley*, 758 F.3d at 839. *See also Israel v. Colvin*, 840 F.3d 432, 437 (7th Cir. 2016). The problem here, as in *Beardsley*, "is that the ALJ did not provide a valid explanation for preferring the record reviewer's analysis . . ." *Beardsley*, 758 F.3d at 839.

In 2010 and 2012, when Drs. Brister and Oberlander rendered their opinions, Ms. Waldron had not yet served her time in prison, and she had not been receiving mental health therapy. As such, over the arc of the entire record, Drs. Brister and Oberlander "looked at a severely incomplete set of the plaintiff's medical records." *Childress v. Colvin*, 845 F.3d 789, 791-93 (7th Cir. 2017). "ALJs may not rely on outdated opinions of agency consultants if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (internal quotations and citations omitted). The mental health treatment Ms. Waldron received after her 2016 release from prison is significant new evidence of her mental health problems that the ALJ should have considered.

Instead, despite the fact Ms. Waldron saw Ms. Martin frequently from September through December 2016, the ALJ discounted their four-month long treating relationship as too short to constitute a "longitudinal relationship" (R. 1170). The ALJ did not adequately support this determination. Compared to Dr. Brister and Dr. Oberlander -- who never even examined Ms. Waldron -- Ms. Martin and Ms. Waldron had an ongoing mental health treatment relationship that the Social Security regulations and guidelines prefer to opinions from *non-examining* medical professionals. While opinions from sources such as social workers are not considered "acceptable medical sources" under the Social Security regulations, they "are important and should be evaluated on key issues such as impairment severity and functional effects." *Gerstner*, 879 F.3d at 262 (quoting SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2006)). *See also* 20 C.F.R. § 404.1527.

The ALJ also discounted Ms. Martin's opinion for lacking support from clinical examinations, but Ms. Waldron underwent regular mental status examinations with psychiatrists during the same time she was receiving mental health counseling from Ms. Martin, and the ALJ does not adequately explain how those examination results were inconsistent with Ms. Martin's conclusions. The ALJ's failure to adequately explain his or her reasons for giving more weight to the opinions of the state-agency psychologists than to a claimant's treating mental health counselor requires remand. *See Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017).

*Third*, we agree with Ms. Waldron that the ALJ failed to explain how her ability to travel between Illinois and Arizona, provide emotional support for her mom, care for her autistic nephew four hours per week, and perform other activities (such as using a cell phone, doing housework, and social networking) was inconsistent with her allegations of severe limitations from her mental health impairments (*see* Pl.'s Br. at 16-17). The Seventh Circuit has repeatedly "emphasized that working sporadically or performing household chores are not inconsistent with being unable to engage in substantial gainful activity." *Childress*, 845 F.3d at 792 (internal citations and quotations omitted). Moreover, the fact that Ms. Waldron cared for her nephew and her mother, where there is a "dearth of information about what [she] did" to care for them, "renders the ALJ's reliance on this activity unreasonable." *Cullinan v. Berryhill*, 878 F.3d 598, 603-04 (7th Cir. 2017) (remanding case where ALJ relied on claimant's ability to care for her cousin in a nursing home and help a friend care for foster children but "the record [was] silent about how [she] helped . . ."). Likewise, it was error for the ALJ to rely on Ms. Waldron's ability to travel to discount her allegations where the record does not indicate -- and the ALJ does not say -- what about the travel undermined Ms. Waldron's alleged symptoms of impairment. *See Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir.

2014) (holding that the ALJ's reliance on the claimant's vacation plans was problematic because the record did not indicate how vacationing was inconsistent with her alleged degree of limitation).

## CONCLUSION

More than eleven years have now passed since Ms. Waldron's alleged disability onset date of June 15, 2007. On remand, the ALJ should take care not to focus on "evidence from particular points between [2007 and the present] to support a conclusion covering the entire period." *Walker v. Berryhill*, 900 F.3d 479, 484 (7th Cir. 2018). Instead, the ALJ must determine whether Ms. Waldron "was disabled at any point" beginning on June 15, 2007, and "remain watchful for the intermediate possibility of [her] becoming disabled" at any time since June 15, 2007. *Id.* In addition, the ALJ should consider whether Ms. Waldron's alleged impairments were "exacerbated by h[er] substance abuse" or, instead, whether substance abuse was the "primary" or "sole[]" cause of her problems. *Voigt*, 781 F.3d at 876, 878.

For the reasons stated above, we grant Ms. Waldron's request for remand (doc # 16) and deny the Commissioner's request to affirm (doc. # 25).[5] The case is remanded for further proceedings consistent with this opinion. We express no view on the result of those proceedings. The case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED: September 27, 2018**

---

[5] Although we are not ruling on Ms. Waldron's additional arguments for remand, we note that the ALJ has not resolved Judge Martin's earlier concern that the ALJ did not adequately explain why she included in the RFC a sit/stand option allowing for one to two minutes of standing for every hour of sitting (*see* R. 1274-75). Although the ALJ noted that Ms. Waldron testified that she needed to stand after sitting, neither Ms. Waldron nor any medical expert in the record stated that she had to ability to sit for one hour, or that standing for one to two minutes was sufficient. On remand, the ALJ should further explain the reasoning behind this RFC limitation.